Case number 17-5196, Nicopure Labs, LLC, et al., Appellants, American E-Liquid Manufacturing Standards Association, et al., v. Food and Drug Administration, et al. Mr. Estrada for Appellants Nicopure Labs, LLC, Mr. Gotti for Appellants Nicopure, et al., and Ms. Powell for the appellees. Good afternoon. Good afternoon, Your Honor. Miguel Estrada for the appellants. I will address the modified risk issue. Co-counsel will address the remaining two issues on behalf of the appellants. Now, under current law, it is perfectly legal to sell e-cigarettes and vaping products for any recreational purpose that appeals to the user. But it is now unlawful for manufacturers of these products and for nobody else to say truthfully that their products do not contain certain substances, such as tar or ash, or that they are smokeless, say, unlike cigarettes, or indeed to repeat the very statements that the FDA and Commissioner Gotti, the head of the agency, have repeatedly made themselves. In fact, in this very rulemaking, in this very rulemaking, the deeming rule, the FDA says, quote, that it believes that the inhalation of nicotine, nicotine without the products of combustion, is less of a risk to the user than the inhalation of nicotine delivered by smoke from combusted products. In this rulemaking, the FDA said, and I quote, the FDA agrees that the use of e-cigarettes, I actually say ends, is likely less hazardous for an individual user than the continued smoking of traditional cigarettes. And in this very rulemaking, the FDA says that it expressly recognized, and I'm quoting recognized, that switching completely from combusted cigarettes to e-cigarettes may reduce the risk of tobacco-related disease for individuals. Those are quotes from this very rulemaking. Similarly, the head of the agency, just one more, said in a speech just a couple of months ago, we, the agency, believe that fully transitioning to ends can reduce the morbidity and mortality associated with tobacco use. The public health authorities in England and Canada have said the same things to the public repeatedly. But we are precluded from saying the same truthful information to the public, although we are not precluded from selling the product to the public. Under conventional First Amendment doctrine, that ought to be subject to strict scrutiny, but in our view, it fails even intermediate scrutiny under central Hudson, both as to prompts three and four. I'm sorry, Judge Pillar, I think I interrupted a question you wanted to pose. Mr. Estrada, because this is a pre-enforcement challenge, it's a little bit unclear what conduct exactly your clients are seeking to engage in, and therefore, what exactly we need to review. So is it your position that if someone associated with one of your client companies wanted to speak on a panel about the relative risks of e-cigarettes or write an op-ed, that they would be restricted in doing so? Or what exactly, which conduct should we be considering, or which speech should we be considering? Yeah, I understand your question, and I think this actually sort of springs from an argument that the government tried to make in page 37 of its brief, which frankly I consider a bad merits argument wrapped in a frivolous rightness objection. Here's the issue. We filed two different complaints in district court and briefed summary judgment. And we made very clear in the briefing of the summary judgment papers that Nicopore had identified in declarations specific statements that he had made and would continue to, would like to make, including A, that his products are smokeless. B, that his products do not contain tar, ash, or many of the products found in combusted cigarettes. C, that the products do not contain diacetyl, acetylpropionyl, or other allergens. And four, you know, the stuff that I actually just opened with, the very things about comparative risks that the FDA repeatedly have said itself. Now we put the Standler, you know, declaration, and we have said that the essence of our challenge, and this is why this reinforcement argument is somewhat of a red herring, is that having to ask permission is a First Amendment injury itself. I understand that that's your sort of leading position. And I think the difficulty is, you know, you start with the premise that these are lawfully sold and used and that the only restriction is a restriction on what can be said. But under the Tobacco Control Act, I mean, isn't that just a product of the time delay for the modified risk product clearance and or the tobacco product? Pre-market review. So if you look at the baseline as you can't sell a tobacco product, be it a modified risk product or a conventional tobacco product, under this act, unless and until there's been pre-market review, then that's a different baseline from the one that you started from. Okay. Judge Pillard, I understand, again, you know, the question, and this is, you know, to the extent you want to view it in that light, to put it harshly, it's a problem of violating, you know, the First Amendment that the agency itself made. If the agency has said, we considered these products inherently unsafe, we will make them illegal to sell to the public, then the claim of any speech issue would fail under the first step of Central Hudson because the product would not be legal to sell. Having said, we will give you several years to continue selling, you know, the product under the pre-market aspect of this, then the product is legal to sell under Central Hudson, and the only question under the speech issue here is whether the government can meet prongs three and four of the justifications that it offers. Now, this brings me to the other of the favorite red herrings that the government likes to use, this whole issue of the drug question, right? And that actually has two components. If you posit a drug-making company that is on the verge of coming out with a new compound that has never been on the market, and that it wants to offer for a therapeutic intended use, say it's going to cure cancer, or say it's seeing Vito's dance, or what have you, but the compound has never been on the market, the FDA would be entitled to say that a speech about that product intended for use for the cure for cancer fails at Central Hudson step one because the product is not on the market. It's not legal to sell. Now, that's case one. Case two is Pearson versus Shalala and Thomason versus Western States in the Supreme Court, where products are lawful to sell, and what the FDA wants to do is to restrict the speech about them. And we know from both of those cases that those cases get treated under conventional First Amendment doctrine, even though the law on the lawfulness of the sale could have been different. And so the mere fact that government could have changed the law or could have arranged the law to restrict the sale doesn't really avail the government once the sale is lawful and what the government has chose is a pure naked speech restriction. But this is a little bit different because it's only during this grace period, this transition period, that the sale is lawful. Yeah, but you cannot suspend the First Amendment for two years. So is that the only time that your clients are concerned about is up until the effective date of the regulation? Well, I mean, we expect that the products will continue to be lawful. We don't know what the outcome of the process will be. Exactly. There's this other issue about the APA and whether the premarket issue also will continue to sort of stand as the agency sees it. Council will deal with some of those issues. But my point to you is that the notion that the government has, at the state or local level, some unlimited power to make things unlawful doesn't include the lesser power to restrict speech about it. So I fully appreciate your argument, and I do think the government has clearly put itself in a very difficult position by asserting on the one hand the, you know, you can't unring this bell and how, you know, addictive these products are and how they really can't be safely marketed. And on the other hand saying, and let's give all this extra time for them to be sold without restriction. Well, if I could say something that is even worse for the government here, and that is how its justifications do not directly advance what it's trying to do and the lack of fit even under central Hudson as applied by the modern court. On the question of directly advance, keep in mind that if you view this as trying to prevent deception, this is vastly over broad, because it's trying to sort of prevent speech even that is demonstrably true. And Sutter in the Supreme Court said that you could not prevent, say, these graphics just on the expectations that some of them could prove to be, you know, misleading after the fact. But more fundamentally, there's an aspect of the statute that is a real first amendment problem for the government. And it is this. I could get every federal judge in this country to agree that everything that I intend to say in every jot and tittle is absolutely the gospel truth. And the government would be required to deny my application of a modified risk product if, in the words of the statute, the FDA concludes that the speech will not benefit the health of the population as a whole. Now think about this. In what world does the government get to deny speech to a citizen that is absolutely truthful on the theory that it is not in the public interest? I believe the government's position is, and this applies also to your pointing out that the FDA gets to say certain things and why don't you get to say those same things. Their position really has to do with context. And we all know, I mean, you go into the supermarket and, you know, the lemonade says it's nonfat and, you know, the butter says no sugar. And I think, you know, certain consumers can think, oh, then that's a diet product that I can consume. And so what they're looking at is how the reasonable consumer would understand a modified risk product and would they think that this is something that I can do. No, that's actually not the case because, you know, the answer to the, when we say it, everybody will understand that it's not, you know, misleading. But when you say it, you're a liar. Well, no, but they say it with a lot of context. If you go through the record and look at where they say the things that you say you want to say, they say them hedged right there. Hedged right there with the qualification. Judge Pillar, sorry to interrupt, but the answer to the point is both Thompson versus Western States and Pearsons versus Shalala. In fact, Thompson actually dealt with this question at page 376, where it says, even if the government did argue that it has an interest in preventing, you know, misleading statement, you know, you could deal with that by requiring each compounded drug to be labeled with a warning that the FDA has not sort of approved this and that there are risks and yada, yada, yada. And in Pearsons versus Shalala, the court expressly dealt with the question how disclaimers are a preferable way to deal with these issues than suppression. So if your objection is context, context can be provided with a disclaimer, not with blanket suppression of truthful speech. As to the second point, you know, the whole question... And would your position take down any of the preclearance regime for tobacco products modified or not? Or just say you can't have a preclearance regime? Well, I think that any, I mean, you know, the point that we're going to get to on the second point is that any preclearance, you know, regime that says that truthful speech can be banned if the government thinks it's not in the public interest or to trouble any judge in this country, right? And, you know, that aspect of the statute, which is, as I said to you, 387KG1AB, it does say that the government basically gets to conclude that truthful speech cannot be uttered if it will cause people, for example, to start using a tobacco product because that is bad for the public health. Now, I will concede that this is an appropriate concern for a public health authority. It's just not one that can be furthered by blanket prohibition on speech. And, you know, just to translate what this does in the words of the Supreme Court, is the banning of truthful speech because of a concern that people, when they hear the information, will make bad decisions with it. And both in Thompson and in Sorrell, the Supreme Court says the governments don't get to do that. If I could just say one word on the fourth prong of Central Hudson, is that although the government likes to go back to the halcyon days of 1980, when we all lived in the, you know, happy days of the Carter administration, and Central Hudson was thought to be a very diluted test, in the modern age, what the Supreme Court has said, as it did in Thompson, an FDA case, is that if the government can achieve its interest in a manner that does not restrict speech or restricts less speech, the government must do so. Now, the government did that in an FDA case. What case are you quoting from there? This is Thompson versus Western States, 535 U.S. at page 371. And it was an FDA case. It has many of the same considerations that the government urges here. And it is absolutely, you know, beyond question that there are many things that the government can use here that will not involve the banning of protected, truthful, non-misleading speech, including uttering the very same things that public health authorities in G7 countries themselves utter, which, if the government thought might be misleading in the lips of others, could be cautioned, dealing with cautionary language, as Pearson indicated. Let me ask you, Mr. Estrada, assuming that we were under the rule, that the pre-clearance for modified risk products regime had taken effect, and the question is, how do we understand the, and here I would limit it to, let's say, a labeling or an advertising claim, and the government is saying, you know, you can't make claims that are modified risk claims on this product. You can't sell this product as a modified risk product unless you've been through this pre-market review. And we're trying to decide, does this just go under the traditional tobacco product pre-market review, or does it go under the modified risk product pre-market review? How would you distinguish that situation from our opinion in Whitaker? To say that this is, there we said that the speech was being looked at for evidentiary purposes to determine which category of review, and I'm sure you have an argument for why that. It is a speech restriction, not that Whitaker applies, and I'd like to hear that. No, but here's the question. I mean, you know, the district court in this case, in footnote 37 of its opinion, looked at the government's Whitaker case and said it doesn't wash. Even discount tobacco, which held the TSA in sort of a punitive, you know, rationale against R.J. Reynolds and Lori Lard on the theory that they had it coming, which doesn't really apply to an entirely new industry here. Right, but I'm interested in your argument. No, no, but even they say that this whole thing of the FDA gets to approve this, you know, because you get to analyze new drugs. Even they say that that did not wash. But the theory about Whitaker is that what is unlawful is the sale of the compound with the intent that it be used for a therapeutic purpose. That is not the statute we have here, right? We have a statute that says that the sale is lawful irrespective of intent. What is unlawful is the speech. I think what's unlawful is the sale of a product as a modified risk product. No, it isn't. And so, too, saw palmetto extract. What was unlawful was the sale of saw palmetto extract as a drug for prostate disease. But if you look at that single two-paragraph sort of discussion in Judge Williams' opinion, first he says that a version of what you are actually espousing, which is what the FDA was arguing, was, as he said, circular. And then he said, but the statute looks at intent. And looking at the speech for the evidentiary purpose of ascertaining intent, so if I said today that I intend to assassinate the President of the United States, the underlying act can lawfully be made unlawful, and the speech is merely evidentiary. That's different. Now, in this case, my clients could come here and confess to you that they intend to sell their products with the intent that they be used to diminish risk, and that would be lawful. It would only be unlawful if they advertise that to the public. I mean, if they make a claim to the public. They could secretly have the intent. They could confess it in a secret letter to the government, but the intent is not made unlawful. It's very different from the drug regime. Like it or not, and foolishly or not, the government has chosen a path in which it has made the sale of the product lawful for any recreational purpose, irrespective of the intent of the manufacturer. And the only thing that is unlawful is the speech. And that, as the district court recognized in this case, has to be analyzed under central Hudson. And under the most recent cases from the Supreme Court, it is a really severe speech restriction that is discriminatory, as against certain speakers, and that keeps them from saying really important information that, you know, could be potentially important and life-saving to many people. Because if you credit what public health authorities in G7 countries, not backward, you know, third-world countries ruled by child dictators, but G7 countries, you know, say changing completely from combusted cigarettes to some of this stuff would save lives. And so there are other things on the balance here, too, and this could be important public policy information that the government is completely suppressing for no good reason under the First Amendment. And this is why this has to be set aside. Thank you, Judge Pillard, and thank you, Your Honor. Thank you, Your Honors. My name is Eric Gotting. I represent both NICAPIR and the Right to Be Smoke-Free Coalition, and I'll be addressing the two other issues on appeal, both the free sample First Amendment issue and the PMTA-APA issue. So with regard to free samples, free samples are expressive conduct, and we know that because Congress told us that. Granted that expressive conduct can be deserving of First Amendment free speech protection, that does not automatically mean that an action becomes protected speech just because it also has expressive content, does it? I agree with you. I think there's some conduct that is not inherently expressive. What would you draw a line that would put tobacco products on the speech side and not put all conduct on the speech side? I think there are two answers to that. First, we look at Texas v. Johnson and the two-factor test, and here in the record there was evidence that manufacturers are intending to send a message with their conduct, particularly with regard to That can't be enough. That can't be enough. Okay. I wouldn't intend to send a message with my conduct if I hit you in the nose. That wouldn't mean that I had First Amendment rights to hit you in the nose, would it? Well, we know that there are cases out there, just count tobacco and Bailey, held that free samples are inherently expressive because of this message, Try me, buy me. Try my product. You will learn about my product and how it performs, how it compares to others, and that is Suppose it were heroin instead of tobacco that I were offering you for free. Try it and you'll like it. Would that make the passing of heroin, First Amendment protection? I guess technically under Texas v. Johnson it could. Okay. You're going to rely on me? No, but it's not a I'll leave it right there. It's a good hypo, but it's not a commercial transaction between people who are in the commercial marketplace buying products that are legal, for example. You can restrict First Amendment free speech if it is illegal and selling cocaine or heroin is illegal. But isn't Mr. That doesn't go very far toward making the act of passing free samples protectable speech. It may have expressive conduct, but the fact that conduct has expressive content cannot possibly render it protectable speech all by itself. That would take way too much ground, wouldn't it? I don't think so. I think that you can look at also what Congress told us. Congress said in the Tobacco Control Act it is regulating, and it quotes, the communication of free samples as a form of communication, as a form of advertising and promotion, because it is enticing, or could entice, underage kids to use these products. So this was, Congress told us they were targeting the communication aspect of free samples. Well, that will not make conduct into speech. It's one Conduct is not inherently speech. Conduct can be speech. Right. Conduct is not inherently speech. The fact that Congress regulates it can't change it into speech, can it? But as applied here, we know that we have record evidence that in the context of vapor products, manufacturers are, one, intending to convey this information about their products, and two, the consumers are going to understand that because vapors are looking to sampling and nothing else to get that information. But, Mr. Gutting, isn't the question not just whether the conduct might be understood to be expressive, but whether the government in regulating is aiming at its expressive content or not? And here the interest really seems to be in keeping addictive nicotine products out of the hands of anybody, really, but they emphasize youth. I agree with you. That is part of their interest, but Congress didn't Do they have any interest that's directed at the expressive? Yes, I think the Content, and where do you find that? It would be the findings, the legislative findings, Section 232, which is ADD 035, and it says, if I hit the right tab, it says, the regulations described in paragraph 30, which is referring to free samples, those were the 1996 regulations, impose no more extensive restrictions on communication by tobacco manufacturers and sellers that are necessary to reduce the number of children and adolescents who use cigarettes. So I'm going to skip down to the such. Such regulations are narrowly tailored to restrict those advertising and promotional practices which are most likely to be seen or heard by youth and most likely to entice them. Congress is talking about messaging here, not just pricing or sales transactions. They're not describing free samples as speech. I think they are. I think they're saying that there's a communication aspect to free samples. Well, advertising and promotional practices is, first of all, it describes it as practices, not as messages or speech. So where were you just reading? I didn't follow. Oh, I'm sorry. ADD 035. Yeah, ADD. Can you give me an appendix page or something? Yeah, so that's the addendum to our brief. So that would be the ñ and I'm sorry, I said 35. It's five. And it is the legislative finding 236. I'm sorry, just which page are you on? ADD? ADD 005. Thanks. Yep. You can go ahead. You can go ahead. So, again, we know that there is in this ñ this is an as-applied claim. So we do have evidence that this is expressive conduct and satisfies the first prong of Texas v. Johnson. And it also satisfies the second prong, because there is this evidence that consumers of vapors are, in this case, vapors are looking for that information through the actual sampling. It is not enough for us, because this is such a personalized experience, for us to say that my e-liquid tastes better than your menthol cigarette. It is not enough for us to say that my device delivers nicotine better than your cigarette. The only way that we can convey that information is through the sampling. And that is why it's expressive conduct. And I think Adam Field said as much. Even though that did involve conduct, it said, when it was describing solicitation, it said part of that process is trying products or services so you can compare to others. And so the merchant can convey information through that sampling to the customer. That is solicitation, and that is protected by the First Amendment. Thank you. Do you want to address the... PMTA? Yeah. Sure. So with regard to the PMTA, commoners suggested that FDA streamline this process so that an application would actually be accepted for scientific review, even if it didn't have long-term studies, long-term product-specific studies. So in other words, FDA would accept the application for scientific review if it included everything else in the PMTA, including a scientific review of publicly available literature. The reason why this alternative was suggested is that FDA found that most of these manufacturers were going to disappear before they ever filed a PMTA because it's so expensive and many of these manufacturers are small. And so FDA responded to this by saying, well, we don't have enough information to make this decision. We weren't asking FDA to make a decision then and there that they would never need long-term studies. All we're saying is, please accept our application so we don't exit the market before we ever file. Seems like this is really hard to evaluate in this posture, and I understand it's important for you because you have to know what you're up against. But the FDA did say that if there were studies that gave them reason to believe that without the kind of long-term field studies that you're talking about, that they could be confident that they would urge you to submit them and they would be happy to see them. There also are these other avenues, like the avenue for the special rule for certain products where if you are making a narrow claim about, you know, no tar or no ash. I think you're thinking of MRTP. I am thinking of MRTP. You're right. But for the general preclearance, isn't there also the substantial equivalence shortcut if there is a product already on the market where they've gotten clearance that other products that are similar can piggyback on the clearance of the already approved product? Yeah, so a couple things. First, substantial equivalence. FDA found, and they're correct, that no e-liquids were on the market as of 2007, so we can't do that. Got it. Now, doesn't that happen, though, iteratively over time? No. If somebody who, you know, if the first out of the gate is somebody that's an e-cigarette or e-liquid, that other e-liquids could show that they were. So that's not just for products that were already on the market before the Act. It's also for products going forward. One product in a type goes ahead and then other products can piggyback under substantial equivalence? Yes, but you always have to have that pre-2007. And we don't have that with e-liquid. Did you say you always have to have the pre-2007 to skip any kind of preclearance? But if somebody gets market clearance under the new regulation, then you still have the substantial equivalence pathway. So if someone is on the market as of 2007, they don't need to do PMT. I understand that. And so anyone who is substantially equivalent to that. I understand that as well. But no e-liquids existed in 2007. I understand that as well. So my question was, if some brave and well-financed e-liquid company does a PMT, it goes through the regime, it gets approved, following that, other products that are substantially equivalent get to use that path. Do they not? I don't. I think the answer is no. Maybe that's a better question for the FDA. The answer is no. So going back to your, you kind of presented the case-by-case scenario that they presented in their preamble. First of all, again, according to them, you're going to have this massive market exit even with that case-by-case approach. The problem we have is we're not getting the signal to the marketplace that we will get to scientific review. And the reason is we are aware of only two applications that have ever made it to scientific review, ever. They all get kicked out at a pre-filing process by FDA. So we're looking at what's actually happening. And so what happens is FDA says, we want to see everything that we want to see in the application. They are telling us right now that because there are no long-term product-specific studies, that we're going to have to do long-term studies. So if we submit a study that doesn't have those long-term studies, we are running the risk of getting kicked out after having spent all that money, getting kicked out before we ever get to scientific review. Perhaps you can explain to me then if G7 and England, for example, have these studies out there. Have those been submitted to FDA by anyone? That's a great question. We can submit them. Actually, we have to submit them as part of our PMTA. But there's a difference between just long-term studies that either FDA has done or academics have done and product-specific long-term studies, which we have to do and pay for. So we would have to do like a clinical study or an epidemiological study on our product. How do you know that? That's what it says in the, not only do we know it because FDA is telling us that in guidance, but if you look at the actual provision. If the British regulatory agency had done a study and looked at A, B, C, and D, and you say your product is A, B, C, and D, you wouldn't have to do anything other than submit. We wouldn't. The British regulatory study. Isn't that correct? That is correct. But the chances of that happening are so slim. Well, that's a different issue. Yes. I mean, that's what's interesting about this case. No one wants to submit because it's burdensome, and yet they say it's perfectly clear that the things you want to say are true. Let me be, just so you understand what we're not saying. We are taking the bet that the study you're referring to, not that it has anything to do with our product, but those general studies out there, in 2022, which is when we have to file our applications, will be good enough to convince FDA that it doesn't need the long-term studies, that enough has been done between now and then that they can approve. But we're taking that bet. We're not taking away, and we're not asking the court to take away from FDA the discretion to not approve our application because it doesn't have a long-term study regarding our product. We are reserving that for FDA. But we need to know now what we are asking is in the deeming rule to have a statement that simply said, look, you can file without long-term studies. You're taking the risk, but you can file without long-term studies, and we will do scientific review. The numbers that we're seeing right now, and we cited to a FDA website, is that only a fraction get through this pre-filing process because those applications aren't including what FDA wants to see, and FDA is telling us they want to see long-term studies in the application. So it's really a process-oriented solution to the market, kind of the mass exit that they're predicting. It has nothing to do with the actual merits of the application. Any further questions? No? Thank you. Thank you. We have a counsel for our police. May it please the court, Lindsay Powell for FDA. E-cigarettes raise precisely the concerns that animate the Tobacco Control Act. They deliver highly addictive nicotine, and they are now the tobacco product most widely used by middle and high school students. There's substantial evidence, moreover, that beginning to use e-cigarettes can later lead to use of conventional cigarettes. How can you claim that these are extraordinarily dangerous, given the government's postponing of the deadline for the controls to 2022? The argument that the bell cannot be unrung, you can imagine rings a little hollow against that factual backdrop. A few things, Your Honor. First, the question about compliance deadlines applies only with respect to the review of new tobacco products. It doesn't apply to pre-market review of modified risk products. I understand that, but that's what Mr. Estrada hung his First Amendment argument on. We can sell these as tobacco products. We just can't sell them as modified risk products, meaning we can sell them and we can't say things about them. Whereas if the nicotine is so hazardous that none of these products should be on the market, with explanation or not, your argument would seem to have more weight. Do you understand the problem? I think you see the same thing in the drug context, Your Honor. And so with the example of saw palmetto, that's a product that could be on the market. The question was whether it could be on the market. I'm sorry, I didn't catch that. Sorry, the saw palmetto is the product at issue in Whitaker v. Thompson. And there, under the analysis required by the pre-market review of drug scheme, the product could be on the market. The question was whether it could be on the market and also make certain claims that turned it into a drug. And you have the same thing here. You have products that can be on the market. I see that as a formal matter. It's just it feels very far afield practically from what we have here in the sense that, you know, the record shows an extraordinary uptake of e-cigarettes among, for example, middle schoolers. There was no extraordinary uptake among aging men with prostate problem of saw palmetto oil in the absence of the control on its sale for that purpose. So here you have what you describe in your materials as a rampant, rampant misuse by young people of these products. And your argument hangs on the notion that, well, they can't be sold as less risky because that's going to make it even worse. But you've also taken the position that, well, let them be sold for a few more years. What's the harm? And I just find that hard to understand and to square with your claims of interest. So these are the two premarket review provisions are also not by any means the only tools that FDA is using to address the public health issues presented by these products. So this summer FDA issued more than 1,100 warning letters against e-cigarette retailers, manufacturers that were marketing these products to youth, violating the restrictions. That starts to sound more like Mr. Estrada's argument. You shouldn't be establishing premarket review for modified risk products. You should be doing other less intrusive things. Congress determined, based on extensive record evidence, that to combat products of this type, the public health problems presented by tobacco products, FDA needs all these tools. So certainly being able to issue warning letters, go after companies that are unlawfully selling these products to young people is not enough. You're getting unlawful sales. The issues that Mr. Estrada was raising concern true statements by the petitioners, right? No, Your Honor. What statements were they wanting to make that are not true? Several, Your Honor. And again, the way this— This ought to be pretty easy. If I'm wrong and you say no, you should be able to tell me why. Well, what is the untrue statement that they're wanting to make? At the outset, I would like to note that the review is case by case, so not every e-cigarette is created the same by any stretch. You'd better do that and answer my question. To take a few examples, Your Honor, they would like to say no diacetyl. Say what? No diacetyl. It's a dangerous substance that is found in some e-cigarettes. Is there diacetyl in the e-cigarettes that are wanting to say that? There is diacetyl in some e-cigarettes. Apparently, even if they— Is there diacetyl in cigarettes that are wanting to say there is no diacetyl? Well, that's something that we haven't yet been able to determine, Your Honor. This is precisely what the— That's a true statement, right? No, Your Honor, I don't concede that. So FDA would need to determine whether it's true as far as it goes. How long have they had that question? FDA has not had that question at all because no application has been submitted to FDA. So every product is different. Some may contain diacetyl, some do contain diacetyl, and some may not. So there's no problem with the no diacetyl? No, Your Honor. Let me further— The false statement simply looks like the one that you have on smokeless tobacco. There may not be exact— There's no ash, there's no combustible tobacco. I would be very happy to take each statement in turn, but it does require a little bit of explanation. So with respect to no diacetyl, even if a product actually contains no diacetyl, which FDA would need to determine, it may contain higher quantities of other harmful substances and therefore present a greater risk to both individual— That still would not change the statement about no diacetyl into a false statement, would it? It would be misleading insofar as it— How is it misleading to say it has no diacetyl when it has no diacetyl? This is precisely the problem that was raised by Light and Lotar in some of the statements made about smokeless tobacco. No, it isn't precisely the same problem. As you know, the Light and Lotar cigarettes, there was very good documentation that they increased the consumption so that despite the fact that per unit they might have less tar, the actual incidence of tar was not any less. Is that not fairly accurate? Or were we deceived by the counsel in the tobacco case? That certainly is part of that history, Your Honor. With a claim like no diacetyl, it may very well convey to consumers that the product is relatively safe or even safe in absolute terms. Wouldn't it be safer than a product that did contain diacetyl? Not necessarily, but it also contains other substances, which is very much part of FDA's inquiry. It may very well be a more harmful substance, and that's what the inquiry is meant to get to. No smokeless or no smoke, there are two things with that. The reason why smokeless tobacco companies can say that is because it's part of the product definition. It's always been called smokeless tobacco. That's how people understand that. That's not true of e-cigarettes. They're not referred to as smokeless products. Nonetheless, if they have no smoke, no combustible, and they have no ash, and they say no combustible and no ash, that's a true statement, isn't it? Some of these products do heat high enough that there is combustion, and they arguably produce smoke insofar as they are heated to create a vapor that is then inhaled and exhaled. And in Competitive Enterprise Institute, this court upheld Department of Transportation regulations that prohibited e-cigarettes on airplanes as smoking. So to say that there's no smoke, they also want to say no tobacco. But by definition, these are tobacco products. So to say that these claims are clearly truthful and non-misleading could not be farther from the truth. And even if we accept that there are some such claims, which there may be, it doesn't mean that FDA is not entitled to assess them ahead of time in the context of the particular products in which they want to be made to be sure that consumers will not be misled. We know from history that when consumers are misled by products of this type, it leads to new generations of children addicted to these products, many of them for their entire life. And these products have not been shown to be safe, and we know nicotine itself is very harmful when used by children and adolescents. So there's a compelling government interest here in making sure that these harms don't happen again. And is that interest again? I know this issue is not technically before us, except it does seem bound up in the question of the government's interest in the preclearance regime. Is that interest not undermined by the length of time that the government has decided to take before these regulations go into effect? No, Your Honor. I mean, there's no dispute that the government has a compelling interest in protecting children and adolescents from nicotine addiction. What about adults? Adults as well, right? Nicotine addiction? Yes, and adults as well, certainly. But to say that you have the governmental interest in protecting people against addiction is not to say that you have any governmental interest in protecting people against truthful information. But we're not only talking about truthful information. We're talking about people being... We are. We're talking about truthful information. We are not going to enter an order that says you have to accept false information. Anything we're doing is going to be doing truthful information, isn't it? The examples that we're talking about that plaintiffs want to make are not clearly truthful. And what Congress and what FDA are talking about is the potential of statements of this type to continue to mislead the public, and that does lead to addiction. People believe products are safe when they're not, and they begin using them, and then they can't stop. And the evidence further shows that using e-cigarettes can lead to the initiation of conventional cigarette use, and we know how dangerous that is. So there is clearly a substantial public health concern here, and it is not undermined by FDA's more global, comprehensive consideration of the tobacco issue, as part of which it has determined to exercise enforcement discretion and not enforce some of these provisions, specifically new product review, for a period of time. But that in no way undermines the strength of the government's interest here. This is a crucial public health concern, and we know what the stakes are here. So Congress reasonably gave FDA these tools in order to prevent a very specific harm, which is the continuing dissemination of information that will mislead consumers who believe these products are safe, and that's in the rulemaking record here that people already do believe they're safe, that they have been misled, and that's one of the things that's leading children to use them. There are also other things prompting that use by children, including the marketing of these products as juice boxes and lollipops and the ability to use them in classrooms because they're shaped like inconspicuous objects like flash drives. So it's a very, very serious concern, and FDA is taking it seriously. Let me ask you, the appellants here argue that the preclearance regime for modified risk products effectively bans their products because it's so onerous. What's your response to that? It is not an effective ban, and it seems premature at best for plaintiffs to be making that argument when they haven't even attempted to meet the requirements set forth. They haven't tested the rigor of that process. Going to a conversation related to this earlier, there are also potential efficiencies in this process, and this relates both to new product review and modified risk review, so that a company putting together an application to market its new product under those PMTA provisions will assemble much of the same information that would subsequently be required if it wanted to also market its product as a modified risk product. And so you're not talking about starting on a clean slate every time. In fact, aren't they virtually identical, the two premarket review processes, except that the modified risk product has to show that it's not just that it's beneficial to the public, but that it's more, substantially more so than any other tobacco product. That's basically the difference, right? They're closely related inquiries, and the modified risk review will focus on the particular representation that's being made, and so the scientific inquiry will look at that representation. But as you point out, all the rest of it also that would have to be shown for a new tobacco product generally is sort of the foundation for that. It's the foundation, yes, Your Honor. And then going to another question raised earlier, although the substantial equivalence pathway is only available for products on the market before the February 2007. I saw that after my questioning of counsel on the other side that, yes, it's only for the pre-2007 products. But there may nevertheless be substantial efficiencies to be gained after these applications are made public, with the exception of any confidential proprietary information provided by the company. And so there is a growing public record both through those applications, through the development of the scientific body of knowledge about these products that will continue to make it easier for companies to put together the materials they need to make the showing required here. And so it's not, again, starting on a clean slate every time. It seems like a lot of the claims that they want to make about modified risk products are claims about specific attributes. And there's, I guess, a slightly more truncated clearance for those. But can you just give us a comparison of what are the efficiencies of that route as compared to a general claim that these are safer? Yes, Your Honor. So that's under subsection G2, and the evidentiary burden is lifted somewhat so that the scientific evidence does not need to be quite as conclusive. There's more of a likelihood standard in the way that it's phrased. Both of these provisions are long enough that it is more helpful just to look at the statute itself. This is on pages 40 and 41 of the addendum to the plaintiff's opening brief. So there is still a substantial showing required of products going through that G2 pathway, and that's appropriate for the reasons I was explaining earlier. A statement that a product doesn't contain diacetyl raises the concerns I mentioned. Formaldehyde is another helpful example. If a product may be put on the market in its packaging, it may not actually contain formaldehyde in that form, but when it's heated and inhaled, it may deliver a great deal of formaldehyde to the user. And so statements that a product contains a reduced level or is free of a substance still raise real concerns and are subject to a rigorous review, but it is a more lenient standard than the G1 review, as your Honor notes. I do want to go back to the drug context for a moment just to note the well-established appropriateness of this type of review, even with respect to truthful claims and even with respect to products that are clearly beneficial. So if you had an e-cigarette that we all agreed could actually help people to quit smoking, that's a huge benefit, great product, it would have to go through premarket drug review as a smoking cessation product. Never mind modified risk review. It would be a drug subject to that long-standing clearance regime. And so the notion that potentially benefit e-cigarette products would have to go through this type of premarket review for modified risk products is not unfamiliar, and it's completely consistent with the First Amendment. With respect to free samples, that conduct at issue there is emphatically conduct. The regulation applies to a commercial transaction. And am I right, I don't think you stated O'Brien in your brief, but am I right that it's basically an O'Brien question, whether the government's interest is directed at the suppression of expression or whether it's directed at the conduct, as in O'Brien, the functioning of the selective service system and here the keeping of addictive nicotine products out of the hands of people who should not easily get them? That is the O'Brien standard, Your Honor, and we would certainly withstand a review under it. The way the Supreme Court has looked at truly economic regulations, so price regulations, it hasn't even gotten to the O'Brien inquiry. It has said, you know, if you're talking about just a requirement, you know, that a product has to be X price, this came up in Expressions Hair Design. It didn't apply or hasn't applied to O'Brien in cases where it has found the regulation to be merely a price regulation. But if we got to O'Brien, you'd win that issue anyway. We would win that issue anyway. We win under Central Hudson, as we explain in our brief, yes. But we don't think you need to get there. And I'm also happy to address New Market Review if the Court is interested. What is the, I guess, the position that you should be doing something more flexible than what the statute commands? I mean, there are some opportunities for the FDA to use some kind of flexibility. Yes, Your Honor. And FDA has said that it will use the flexibility that it has afforded by statute. And so it's clear that long-term clinical studies may not be required in every case. But that will be a case-by-case inquiry to determine whether the evidence provided, whether it's a long-term study or something in the alternative, is sufficient to demonstrate compliance with the statutory standards. So the standards themselves are clearly set forth by statute. And in each case, the applicant will have to show compliance with the standard. And FDA has said that it will exercise its flexibility to the extent consistent with that framework. And as I mentioned, there may be opportunities for further efficiencies in that process. So FDA is certainly amenable to applicants relying on earlier applications to the extent that the information provided is relevant and helps make the showing required by statute. But FDA was required to follow the statute and was certainly not arbitrary and capricious in describing the way it would provide flexibility here. So there's a reference in the brief that not many applications have been filed. Of those applications, few have been approved, but some have. Is that correct? I do not believe there are any e-cigarette applications that have yet been approved under either new product or modified risk review. Any date for a decision? I do not believe any currently pending applications. There are very few within that product category that have been submitted. In other words, what I hear you saying is the flexibility, et cetera. Basically, it's a piggybacking flexibility. And there's nothing to piggyback right now. Certainly piggybacking is one of the ways to gain efficiency. The growing body of scientific evidence is also one. I mean, people are studying this question very carefully because it is such a significant public health concern. And as that body of evidence grows, that evidence is available to these companies as they submit their applications. But, yes, I think it does appear that people are reluctant to be the first movers here when they won't benefit from those efficiencies. For these reasons, we ask that the court affirm. Thank you. Thank you, Your Honors. Just two points. Going to O'Brien, the reason O'Brien doesn't apply here is because O'Brien requires that the interest of the government has nothing to do with commutative elements. Here, as I pointed out, we do have an interest by Congress in the commutative element of free samples as expressed in the THCA and the provision that we talked about. Secondly, I will note the PMTA does, the actual provision itself, does actually build in some flexibility. It says that long-term studies are only required when appropriate and that other valid scientific evidence can be used to satisfy the population effect standard. The alternative we were talking about doesn't even implicate that because we're not taking the discretion away from FDA to say, look, in 2022 you submitted this without any long-term studies and we think you should have and they can disapprove. What we're saying is that FDA, with the case-by-case basis approach, they concluded that the vast majority of these people will not be around. They will not file PMTAs. Again, we're asking for more of a process-oriented management of the applications to avoid that problem that they have concluded exists. I believe that FDA would have, especially under the flexibility that PMTA has in its own language, would have the flexibility and discretion to do that, and they should have, and it was arbitrary and capricious not to. Thank you. Thank you, Your Honor. Now, counsel for the government started by saying two things. Number one, that nicotine is bad for you, and number two, that there is a problem with the use of these products by youth. It is important to know that the government already puts a nicotine warning on these products and that any public health issue that has to do with how bad this is for you can be dealt with a disclaimer, as you said in Pearson versus Shalala. As to the whole question of youth, it is a public health concern, but, of course, no one here is urging that we be allowed to sell anything to youth, which is, of course, illegal. Our point here is that we are trying to make truthful speech to adult consumers about a lawful product. This recalls something that was established in the law a long time ago, in 1957, in an opinion by Justice Frankfurter, when the state of Michigan tried to ban the publication of risque magazines because they might be dangerous to the morals of the children. And the case went to the Supreme Court, where Justice Frankfurter said that in order to ban those magazines, you would be burning down the house to roast the pig, and that the government could not reduce the entire population of the state of Michigan to reading only what was fit for children. And, yes, of course, the government has a concern about youth. It should use means calculated to deal with a problem having to do with youth. Isn't there, Mr. Estrada, also a problem of addiction among adults? Well, again, if that is a public health issue, it can be dealt with tools that are appropriate to public health, Judge Pillard. My point here is not that the government As I understand it, that wasn't Congress's position. I mean, you may disagree with it, but that wasn't Congress's position in enacting the Tobacco Control Act. But, Judge Pillard, again, the Supreme Court said both in Thompson v. Western States and more recently in Zorro that if the speech is true, the government cannot ban it on the theory that adults would be banned. Well, under commercial speech doctrine, if the speech is true, it may be subject to regulation because if it's misleading or potentially misleading, there are even free speech. I will remind you that both Thompson and Zorro were all commercial speech cases and that Thompson was an FDA case involving compounded drugs where the FDA wanted to restrict the speech because it was not good for the public and where the Supreme Court said expressly that if the speech is truthful, it cannot be banned on the theory that it will cause people to make bad decisions. Now, if addiction is a public policy problem, the government has other tools to deal with it, but the banning of truthful speech, especially on a blanket basis as here, is never an appropriate tool for the government. Now, Judge Santel asked another question about compounds and their presence, and I think I should point out, and this is dealt with at page 27 of the brief, that this statute has a requirement that the FDA obtain from each manufacturer by brand and sub-brand a list of potentially harmful constituents of each brand and sub-brand and that it then publish them in a manner accessible to the public. All the citations are on page 27 of the brief, and so what the government is saying is that when we assert that my product does not have diacetyl, which is something that is published on a government website as required by statute in a manner to be accessible to the public, I am committing something that is contrary to the law, but the FDA in saying the same thing is complying with the law. And there is a plethora of similar statements that are espoused by the head of the agency in speeches every other day and by the agency itself. Is it your understanding, Mr. Estrada, if your clients wanted to, as a form of advertising, simply post a sign in the metro or put on their packaging the list of ingredients that FDA would deal with that as a misbranded or adulterated product? I think a fair reading of the statute is that any implied health claim which says my brand doesn't have this, which the other brands have, or my brand doesn't have this. Well, I'm asking you not that claim, but just a printing of the ingredients. Well, one of the problems with schemes that are sensorial, Judge Pillard, is that my clients are subject to the chilling effect, and I don't know that I would readily advise a client to take a chance to be sanctioned by a government agency or to go close to the line, because the Supreme Court may say 40 years ago that commercial speech is sturdy, but it's a lot less sturdy when the sanction is actually pure censorship without any procedural avenues to actually get to a court, which is why we're here. One of the things that I should have mentioned earlier is that on the tailoring aspect of this, not only are there far better ways of dealing with the issues that the government claims to be concerned about, like the possibility of deception and problems with youth, but the government has gone to the most extreme form of First Amendment offense. It has gone to the pure censorship prior restraint, the type of thing that in a legal system is almost never available except with the strictest substantive and procedural safeguards. And it would be hard to say in most cases that that is something that would possibly meet prong four of central Hudson when we are here telling you that we want to say the same things that public health authorities themselves say and to publicize the same thing that the government publicizes in its own websites. Thank you so much. Thank you. We'll take the case under advisement.
judges: Rogers, Pillard, Sentelle